Timothy Paul HARVEY, David Allen Harvey, and James Loren Harvey, Appellants,

v.

UNITED STATES of America, Appellee.

No. 87–5185.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 18, 1987.

Decided June 22, 1988.

Randolph Daar, San Francisco, Cal., for appellants.

Ted McBride, Rapid City, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY and MAGILL, Circuit Judges.

HEANEY, Circuit Judge.

## I. INTRODUCTION

Three brothers, Timothy, James, and David Harvey, filed motions in district court pursuant to 28 U.S.C. § 2255, seeking to set aside guilty pleas. They claim: the guilty pleas were taken in violation of Rule 11 of the Rules of Criminal Procedure and not voluntarily and knowingly made; they received ineffective assistance from their court-appointed counsel; and their guilty pleas would not have been entered but for their lack of knowledge, and the ineffective assistance and coercion of trial counsel. After an evidentiary hearing, the district court denied the motions. We affirm.

On August 17, 1984, special agents of the Federal Bureau of Investigation searched, pursuant to a warrant, the "Wahle Ranch," near Pringle, South Dakota. The agents seized equipment and chemicals for manufacturing methamphetamine (commonly known as "speed") and approximately fourteen pounds of methamphetamine. The agents also arrested David, James, Joe Foos, and Rodney Shaddy at the ranch. Timothy turned himself in at the Pennington County Jail on September 3, 1984.

The search and arrest followed months of investigation. The government, in a written statement of the factual basis for the Harveys' pleas, described the investigation. We summarize it here.

Michael Riley, who the government anticipated calling as a witness, met the Harveys in Kansas in late 1979 or 1980. Later, while living in Indiana, he was called by one of the Harveys who asked him to sell some "crank" (a methamphetamine). Riley sold methamphetamine supplied by the Harveys in the following years. Timothy and David told Riley that Timothy was in charge of the methamphetamine operation. At the time of his arrest, on August 17, 1984, in Rapid City, South Dakota, Riley

had $20,000 in his possession which Timothy had paid him to satisfy a debt for selling methamphetamine in the Evansville, Indiana area.

Another expected government witness was Michael Marlow. The Drug Enforcement Agency (DEA) arrested Marlow in November of 1983. In a plea agreement with the government, Marlow agreed to cooperate in the investigation of the Harveys. He explained to the government that he had distributed marijuana and methamphetamine for Michael Riley in the Evansville, Indiana, area in the summer of 1981.

In January, 1982, Riley asked Marlow to transport some methamphetamine for him. Marlow met David and Timothy in Missoula, Montana. Timothy delivered five pounds of methamphetamine to Marlow's motel room. On other occasions, Marlow made deliveries for Riley and was once present when Riley paid Timothy $50,000 in cash.

In the summer of 1982, Marlow helped the Harveys transport precursor chemicals and freon (used to make methamphetamine) to David's residence in Coeur d'Alene, Idaho. There, Marlow was introduced to James, Joe Foos, and another Harvey brother, Donald. Marlow toured the kitchen which contained a number of glass beakers, flasks, and chemicals. Marlow noticed an overpowering acrid odor.

After Marlow began cooperating with the government, one Donald Ewers asked him for assistance in arranging a methamphetamine deal with the Harveys. On May 5, 1984, in a motel in Denver, Colorado, Timothy turned over approximately four pounds of methamphetamine to Marlow. Timothy told Marlow he had been "cooking" for three days without sleep. Timothy's hands were red as if sunburned.

The next time these two met, on May 10, 1984, in Coeur d'Alene, Idaho, DEA and FBI agents videotaped Marlow making a payment of $28,000 to Timothy. Timothy told Marlow that they had relocated their manufacturing laboratory to a ranch, and that once fully set up, the laboratory could process fifteen to twenty pounds of methamphetamine a week.

On June 28, 1984, Marlow met special agents of the DEA and FBI in Rapid City, South Dakota. Under instructions from the special agents, Marlow contacted Timothy, stating that Ewers wanted a sample of the methamphetamine. Timothy later met Marlow at a motel room and told Marlow that his brothers and others had cooked one hundred pounds of methamphetamine. Timothy also gave Marlow a 6.8 ounce sample of methamphetamine. On two subsequent occasions in July and August of 1984, Timothy gave Marlow 6.7 pounds and 18.5 ounces of methamphetamine.

Rodney Shaddy, another potential government witness, had known the Harveys as a child in Liberal, Kansas. Timothy had offered Shaddy a job as a bookkeeper and secretary. According to the government, Shaddy would have testified that Timothy, David, Donald, and James each spent between $3,000 and $4,000 a month. Timothy carried the money and acted as the banker.

The government conducted court-authorized electronic surveillance of a telephone call on August 8, 1984, in which James told Timothy that Marlow had something "for us" and that Marlow asked if Timothy had "something for him." Timothy agreed that James should "tell him to come up." On August 12, 1984, the government recorded a conversation in which Marlow asked Timothy to bring the "one that I need." Timothy said that would be difficult "because I gotta go clear up to the ranch to get that baby."

The government also intended to introduce: papers relating to the purchase of the Wahle Ranch in the name of Timothy, James, and David Harvey and Joseph Foos; documents showing ownership by these same individuals of a semi-truck and trailer; notations in a small notebook found during the search of the ranch which described the difficulties Timothy had with Joe Foos and Donald in running "the company."

A chemist for the DEA, Sanford Angelos, analyzed the substance which had been purchased from the Harveys or seized at

the ranch and determined that it was methamphetamine. He believed the equipment and chemicals seized at the Wahle Ranch would be capable of manufacturing several hundred pounds of methamphetamine.

Attorneys were appointed to represent the Harveys: James Wilson to represent Timothy, Gene LeBrun to represent James, and John Burnett to represent David.[1]

The United States issued indictments on August 29, 1984. Each defendant pleaded not guilty. A superseding, fourteen-count indictment was issued on September 26, 1984. The indictment named Timothy in twelve counts, David in four counts, and James in four counts. Each of the defendants was charged with membership in a conspiracy to manufacture, distribute, and possess methamphetamine, 21 U.S.C. §§ 841(a), 846; with possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a); with at least one count of travel in interstate commerce to carry on a business involving the manufacture and distribution of methamphetamine, 18 U.S.C. § 1952; and with at least one count of the unlawful use of a communications facility, 21 U.S.C. § 843(b). Additionally, Timothy was charged with conducting a continuing criminal enterprise (CCE), 21 U.S.C. § 848, and distribution of methamphetamine, § 841(a).

The Harveys pleaded not guilty to the charges against them. Thereafter, David, Timothy, and James twice moved for continuances. The district court granted the first set of motions for continuances. Before the court ruled on the second set, the Harveys entered pleas of guilty. On December 27, 1984, Timothy pled guilty to the twelve counts in the indictment naming him. On December 28, 1984, David and James pled guilty to every count naming them.

On February 8, 1985, the district court sentenced the Harveys. The court sentenced Timothy to thirty years under the CCE count, with the sentences under every other count to run concurrently with the thirty year sentence; David to consecutive sentences of five years on each of three counts and four years on one count for a total sentence of nineteen years; and James to consecutive sentences of five years on three counts and one concurrent sentence of four years on one count, for a total sentence of fifteen years.

On June 10, 1985, with new attorneys representing them, the Harveys filed the section 2255 motion presently before this Court.

## II. PLEAS

### A. Rule 11 Violations

The Harveys claim their guilty pleas were entered in violation of Rule 11 of the Rules of Criminal Procedure.[2]

A violation of Rule 11 does not automatically command relief on collateral attack. Violations which are "formal violations" fail in this respect. *See United States v. Timmreck*, 441 U.S. 780, 783–84, 99 S.Ct. 2085, 2087–88, 60 L.Ed.2d 634 (1979). In *Timmreck*, the Supreme Court recognized that a formal violation of Rule 11 is cognizable on collateral attack only if it creates: (1) an error which is jurisdictional or constitutional; (2) a defect which results in a "miscarriage of justice;" (3) an omission inconsistent with the "rudimentary demands of fair procedure;" or (4) "extraordinary circumstances where the need for the remedy afforded the writ of habeas corpus is apparent." *Id.* at 783, 99 S.Ct. at 2087 (quoting *Hill v. United States*, 368 U.S.

---

1. James Wilson had practiced as a prosecutor in the State's Attorney's Office from 1957 to 1963. He served as a United States Magistrate for ten years, an appointment which ended about one month before he began to represent Timothy.

    Gene LeBrun began the practice of law in 1964, concentrating in the areas of civil litigation and corporate law. He gained most of his experience in criminal matters through court appointments.

John Burnett began practicing law in 1976 at the Pennington County Public Defender's Office. He served as its director from 1980–83. He handled numerous criminal matters, including one argument before the United States Supreme Court.

2. Because of our holding, we do not address whether the Harveys failed to raise the question of a Rule 11 violation prior to this appeal.

424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)); *see also United States v. Patterson,* 739 F.2d 191, 195 (5th Cir.1984).

■ The Harveys point first to the fact that the judge violated Rule 11 by not informing them at the plea hearing of the nature of the charges against them.[3] The Harveys cite a number of cases stating that Rule 11 requires the district court to inform the defendant of the nature of the charges against him or her. *See, e.g., United States v. Punch,* 709 F.2d 889 (5th Cir.1983). The Harveys claim that a reading of the indictment and accompanying explanation of it by the court was especially important in this case where the defendants were young and unsophisticated and the charges complex. *See United States v. Dayton,* 604 F.2d 931 (5th Cir. 1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980).

■ This case presents a violation of Rule 11(c)(1).[4] The indictment was not read or explained to the Harveys in open court.[5] Under Rule 11(c)(1) the court should have explained the charges against the Harveys, in the context of the facts of this case, instead of relying on counsel to do this.

■ The cases cited by the Harveys mandating a reading or explanation of the charges by the court, however, involved direct appeals from the plea hearings. The present case is a collateral attack, and, as stated above, we can only review for "non-formal" violations of Rule 11.[6]

■ We believe the Rule 11 violations here are "formal" under the *Timmreck* standard. We cannot say that the district court's error caused a "miscarriage of justice," violated the "rudimentary demands of fair procedure," or was made in a case presenting "exceptional circumstances." While these violations could prove significant in analyzing whether the Harveys' pleas were knowing and voluntary, *in themselves,* they cannot command relief on collateral attack.

## B. Knowing and Voluntary Pleas

The Harveys contend that their guilty pleas were not knowing and voluntary. In analyzing the Harveys' claims, we must be mindful that by pleading guilty, a defendant waives the constitutional rights against self-incrimination, the right to confront one's accusers, and the right to a trial by jury. *Griffith v. Wyrick,* 527 F.2d 109, 112 (8th Cir.1975) (citing *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969)). "The strong presumption is against the validity of waivers of constitutional rights, and the acceptance of a plea of guilty must be approached with the utmost solicitude." *Id.* (citing, *e.g., Von Moltke v. Gillies,* 332 U.S. 708, 723, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948)). The record must affirmatively demonstrate, under the totality of the circum-

3. The text of Rule 11(c)(1) states: "[b]efore accepting a plea of guilty * * * the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands * * * the nature of the charge to which the plea is offered."

4. This case does not present a violation of Rule 11(f). As a factual basis the United States Assistant Attorney offered the written summary mentioned above. As the district court on collateral review noted, this factual basis did not cover one of the counts against David. The United States Attorney, however, stated on the record additional facts to support that charge. We think the district court properly satisfied itself that there was a factual basis for the Harveys' pleas.

5. The trial court specifically noted at the plea hearings that the length of the indictment persuaded it not to read the indictment to each of the Harveys. The trial court also asked Timothy and James whether they had read the indictment. Each responded that they had. David responded that he understood the charges against him. While a verbatim reading of the indictment may not be required under Rule 11, we believe a more thorough probing of the charges is required. *See United States v. Punch,* 709 F.2d 889, 893–94 (5th Cir.1983); *United States v. Van Buren,* 804 F.2d 888 (6th Cir.1986).

We do not need to discuss whether this error would be harmless under Rule 11(h).

6. The Harveys request that in light of the Harveys' ignorance of their rights, including their right to appeal a Rule 11 violation, the violations here should be viewed as if on direct appeal. *Timmreck,* however, clearly does not permit this.

stances, that the plea was voluntary, and the trial judge must "establish by inquiry as thorough as the circumstances demand its constitutional validity." *Id.* (citing, *e.g.,* *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969)).

In addition, for relief under section 2255, a petitioner must show prejudice, i.e., that he or she would not have pled guilty but for the violation. *See, e.g., United States v. C.W.E.H.,* 838 F.2d 993, 994 (8th Cir. 1988) (per curiam).

### 1. Understanding the Nature and Elements of the Offenses

We first address the question whether the Harveys understood the nature of the charges against them. *See United States v. Nieuwsma,* 779 F.2d 1359, 1361 (8th Cir.1985). A true understanding requires a knowledge of "the law in relation to the facts" of the case. *Nash v. Israel,* 707 F.2d 298, 302 (7th Cir.1983) (quoting *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969)).

At the outset, we observe that each of the Harveys stated at his plea hearing that he received a copy of the indictment and understood the charges against him. Each attorney for the Harveys also stated on the record that he had explained the charges and that he believed his client understood them. Thus, the record in this case is neither "silent" on the question of knowing waiver,[7] nor suggestive of a failure to understand. *Cf. Nash,* 707 F.2d at 302 (defendant expressed a lack of understanding and trial judge failed to ensure an understanding through further explanation of the charge). Such statements at the plea

hearing provide persuasive evidence of an understanding. *See Camillo v. Wyrick,* 640 F.2d 931, 935 (8th Cir.1981).[8]

■ In attempting to overcome these statements, the Harveys now deny that their lawyers ever explained the charges to them. Timothy asserts that Wilson himself admitted to an inability to understand fully the nature of the CCE charge. He also asserts that his civil attorney, Tim Vander Heide, informed Wilson that Timothy did not understand the nature of the charges against him. Wilson agreed he talked to Vander Heide, but Wilson testified that he then visited Timothy at the jail and further explained the charges. Wilson took notes during this discussion on a document introduced at the evidentiary hearing. He also testified that he gave Timothy discovery materials, which he and the other attorneys requested, and discussed them with him.

Other than Timothy's bald assertions that his attorney did not explain the charges to him and that he did not understand the charges, we find little evidence in the record to overcome the persuasive evidence of Timothy's statements at the plea hearing.

■ The evidence of an unknowing plea by James or David is even more scant. James did not specifically testify that he did not understand the charges against him. Nor did he testify that his lawyer, Gene LeBrun, failed to explain the charges to him.

■ David also did not testify that he did not understand the nature of the charges against him, although he did state that his attorney, John Burnett, did not

---

**7.** The district court also carefully advised the Harveys of the maximum penalty for each of the counts and the constitutional rights he would be waiving by pleading guilty. Each of the Harveys stated that he understood the maximum penalties and his constitutional rights. Each stated that he wished to waive his constitutional rights by pleading guilty.

**8.** The Harveys point to *Richardson v. United States,* 577 F.2d 447, 450 (8th Cir.1978), *cert. denied,* 442 U.S. 910, 99 S.Ct. 2824, 61 L.Ed.2d 276 (1979), where this Court recognized the rule that statements by the defendant at Rule 11

proceedings are accepted as conclusive unless he or she reasonably alleges why this should not be so. The Harveys assert that they have made reasonable allegations why their statements at the Rule 11 proceedings should not be accepted. In *Richardson,* however, we were determining whether the district court erred in refusing to grant an evidentiary hearing on the matter of voluntariness. The district court here in deciding to hold an evidentiary hearing has already decided that the Harveys' claims were not merely conclusory.

explain the "law" to him.[9] Burnett disputes this. Both LeBrun and Burnett testified that they gave James and David the discovery materials and discussed the materials with them.

As to David and James, we also do not find sufficient evidence in the record to overcome the persuasive evidence of their statements at their plea hearings. We therefore hold that the district court did not err in finding that Timothy, James, and David understood the nature of the charges to which they pled guilty.

### 2. Coercion

Each of the appellants contends he was coerced by his attorney into pleading guilty. We note first that at the plea hearings for the Harveys, each said no threats or promises had been made to induce him to plead guilty. We thus must review the record for evidence which can overcome this persuasive evidence of voluntariness. *See Camillo*, 640 F.2d at 935.

■ Timothy Harvey claims he pleaded guilty to all eleven counts in the indictment which named him, even though he was not guilty of the charges in every one of those counts. According to Timothy, he told his attorney he was not guilty of the CCE charge. His attorney, however, ignored his claims of innocence, and coerced him by limiting him to three plea alternatives: (1) plead guilty to the CCE count and the government would dismiss the other counts and recommend at least a twenty-five year sentence; (2) plead guilty to the CCE count, cooperate with the government's investigation of the methamphetamine operation, and the government would recommend a ten year sentence; or (3) plead guilty to every count and the government would consider him as cooperative by foregoing his right to go to trial, and Timothy would serve about ten years. According to Timothy, Wilson first recommended the second option, but after Timothy could not offer the kind of assistance the government sought,[10] Wilson urged acceptance of the third option.

Wilson testified that he did recommend that Timothy cooperate with the government's investigation because the evidence against him was strong. But Timothy refused to give information on anyone else. Therefore he suggested that Timothy plead guilty to the one CCE count. He never suggested the third option of pleading guilty to all twelve counts,[11] although, once Timothy proposed it, he said that the court might take this into account as evidence of a "contrite heart." He vigorously denied that he ever suggested that Timothy would likely serve only ten years, with good time, if he pled guilty to all the counts naming him. He also denied that Timothy told him that he was not guilty of certain counts.

A letter of December 4, 1984, supports Wilson's explanation. In this letter, Wilson explained to Timothy the plea bargains offered by the United States Attorney. He mentioned the first two options but not the third.[12]

---

9. Moreover, each of the Harveys asserted that he was innocent of certain counts and that he communicated this to his lawyer. To have known he was innocent, he must have known what he was innocent of, i.e., that he *understood* the charges.

10. By cooperation, the government meant information "on" or "about" Paul Greenwood, whom the government believed had worked with the Harveys in producing methamphetamine.

11. Wilson testified that he did not state on the record at the plea hearing his disagreement with Timothy's plea to all twelve counts because he did not think the plea to the counts other than the CCE one really would make a difference in the sentence. As it turned out, the sentences on the other charges run concurrently with the CCE charge.

12. In the letter Wilson stated:

I have previously advised you that the Government has a very strong case. It is my feeling that you will be in a better posture with the sentencing judge if you plead guilty to the one count, even without any deal, rather than go to trial when there is no defense.

Of course, Tim, if you have knowledge of Greenwood being involved in illegal activity, my recommendation would be that you cooperate and obtain some degree of leniency for this cooperation. If, as you say, you do not wish to and cannot involve anybody else, but are willing to pay the penalty for what you did, I would think that your interest would be better served by entering a plea of guilty without a deal rather than go to trial in the face of overwhelming evidence.

The record provides insufficient evidence to overcome the persuasive evidence of Timothy's statements at the plea hearing of the voluntariness of his plea. We therefore affirm the district court's finding that Timothy was not coerced to plead guilty.

■ James Harvey asserts that his attorney, John LeBrun, coerced him by limiting him to two alternative plea options: (1) plead guilty to two counts and cooperate with the government's investigation; or (2) plead guilty to all four counts. James claims he told LeBrun that he was not guilty of at least three of the four counts. According to James, LeBrun told him repeatedly that there was "no way to beat" the government's charges, and that if he was not going to cooperate (and plead to two counts), he might as well plead guilty to every count because a complete admission of guilt might be viewed as a form of cooperation. LeBrun arranged a telephone call between James and his wife immediately prior to the plea hearing in order to have her urge James to plead guilty. According to James, LeBrun never suggested the option of fighting the charges and going to trial. And, when James mentioned the possibility of going to trial, LeBrun allegedly told him that "we will lose on them."

LeBrun testified that James admitted his guilt and never claimed he was innocent of any of the charges.[13] LeBrun stated that he advised James not to plead to the four counts, but rather urged James to accept the plea bargain offered by the government and cooperate. He said he was surprised by James's decision to plead to four counts. He thought that it would have been better to go to trial than to simply plead to the four counts.[14] At the plea hearing, LeBrun mentioned on the record that James had rejected the alternative plea bargaining arrangements against his advice.

Other than the statements by James, the record supports LeBrun's testimony, namely that LeBrun advised James against pleading guilty to the four counts, and James, of his own free will, chose to plead guilty to four counts.

■ David Harvey claims that he was coerced into pleading guilty instead of being allowed to go to trial, in spite of his being innocent of some of the charges. He believed his attorney was working with the United States Attorney, and that he had no option but to plead guilty. David testified that his attorney told him that the evidence was "insurmountable" and "kept on him" at every meeting and even called him a liar in an attempt to convince him to accept the plea bargain offered by the government and to forego a trial. He asserts that in

13. James's statement at his sentencing hearing also supports this:

> I am sorry I did what I did. I am also sorry for the misery and the pain I brought upon my wife and my mother and the whole family. I am glad we got caught. It is over. It will never happen again.

14. In a letter of November 29, 1984, LeBrun explained to James an earlier plea bargain offer which James had to accept by December 3, 1984. Under it James would have had to plead guilty to one count and might have been sentenced under the Youth Corrections Act, 18 U.S.C. § 5005, (now repealed). LeBrun stated:

> As I have previously advised you, based upon my investigation of the procedures followed by the Government and in the facts as they have been disclosed to me and as I have determined from my own investigation, the Government has sufficient evidence to present to the jury and from which the jury could conceivably convict you on all four Counts. Judge Andrew Bogue, not unlike other Federal District Court Judges, could conceivably sentence you to the maximum under each Count in the event you are so convicted by a jury. Further, upon conviction, the Court could conceivably fine you the maximum amount under each of the four Counts. The Court does, however, have somewhat of a reputation of being much less harsh on people who cooperate with the Government and who enter pleas as part of such cooperation. Obviously, if you would enter a plea agreement with the Government whereby you would enter a plea to the unlawful use of the telephone Count, the Government would dismiss the other three charges. There is no guarantee that the court would sentence you under the Federal Youth Corrections Act, however, with the Government, not opposing such a request and with your cooperation with the Government, we have no reason to believe the Court would not follow that recommendation.
>
> \*　\*　\*　\*　\*　\*
>
> If you decide not to pursue the plea bargaining proposed, we will proceed for trial \* \* \*.

the holding cell prior to the plea hearing he was still convinced that he wanted to go to trial. At that time, however, Burnett told him that James was cooperating (when in fact he was not). He also told David that they should not "make the judge mad." Finally, he told David that if he pled guilty to to all the counts, the district court might view that as a form of cooperation. Thus, according to David, he had no option but to plead.

Burnett testified that David never told him that he was innocent of any of the charges.[15] Burnett claims that he never made a firm recommendation to David but only explained the two different possibilities, namely plead to one count and cooperate, or plead to all four with a promise by the government not to prosecute him on other charges. David admitted his guilt early on in their discussions. Burnett admitted telling David that James was cooperating, but he claims it was an honest mistake. Burnett said that David willingly accepted one of the alternative plea arrangements. He claims he was willing to try the case.

The testimony of David and Burnett is essentially contradictory. The statements of record support Burnett.

We cannot say that the record as a whole indicates that the Harveys' statements at the plea hearings should be disregarded. We therefore hold that the district court did not commit clear error in finding that the Harveys were not coerced into pleading guilty to the counts with which they were charged.

## III. INCOMPETENT COUNSEL

The Harveys contend that each of their attorneys was ineffective and therefore their guilty pleas were involuntary and

unknowing and in violation of their sixth amendment right to effective assistance of counsel. To prevail on an ineffective assistance of counsel claim, a defendant must show that his or her counsel's performance fell below an "objective standard of reasonableness" and that, but for this ineffective assistance, there is a reasonable probability that the defendant would not have pled guilty. *See Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).[16]

### A. Inadequate Investigation

An attorney must make reasonable investigations or make reasonable decisions to forego particular investigations. *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984). It is undisputed that the Harveys' lawyers undertook certain kinds of investigation, including: interviewing their clients, obtaining discovery materials (such as the search warrant and the affidavit and application for the wiretap), reading transcripts of the wiretaps, and research. The Harveys, however, claim that their lawyers failed in a number of other ways to investigate or prepare their cases adequately.

#### 1. Donald Harvey

■ First, they claim that each attorney failed to investigate adequately how to handle a government witness, Donald Harvey, who had agreed to testify against his brothers. The government provided each defense lawyer with a copy of a thirty-four page statement by Donald. These copies were given to the defense lawyers with the understanding that the lawyers would only read the statement to their clients and that a portion of the statement (about two pages) would not be read to them.

---

**15.** At his sentencing hearing, David stated: "to all the people who I have caused pain and sorrow, especially to the families of anybody who might have received our illegal drugs, and I would like to say I am sorry to my family and to my friends and, Your Honor, I know I committed this crime and I have to pay for my crime."

**16.** As the previous section highlighted, the Harveys claim their attorneys made many promises

which were not kept or statements of fact which were false. For example, Timothy claimed his lawyer told him he would receive a ten year sentence, with good time, if he pleaded guilty to all the counts against him. If accepted, many of these allegations would constitute examples of ineffective assistance of counsel. For the reasons discussed in the previous section, however, we hold that the district court did not err in finding the Harveys' assertions not credible.

Donald Harvey's statement does not seem to have been vital to the government's case-in-chief. It was not relied on by the government in its statement of the factual basis for the pleas. Wilson learned from the government that it planned to call Donald, if it would indeed call him, as a rebuttal witness.

Nonetheless, the Harveys seemed to think the statement was important, and their lawyers recognized this. Wilson testified that his client, Timothy, considered pleading guilty soon after Donald's statement was read to him. LeBrun testified that the day after that statement was read to his client, James, the three brothers decided to plead guilty. Although Burnett did not testify as to David's reaction to Donald's statement, he did state that "he felt especially after hearing Donald Harvey's statement I needed more time to prepare for trial."

This Court has recognized that even when an "insubstantial issue is deemed by both counsel and client to be significant enough to trigger the decision to plead guilty, then there arises a duty on the part of the defense counsel to obtain the specifics surrounding the key factual issue." *Ford v. Parratt,* 638 F.2d 1115, 1118 (8th Cir.), *vacated,* 454 U.S. 934, 102 S.Ct. 467, 70 L.Ed.2d 242 (1981) (for further consideration in light of *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)), *on remand,* 673 F.2d 232 (8th Cir.), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).

There are differences, however, between *Ford* and this case. In *Ford,* the defendant agreed to plead guilty to a rape charge if the government dropped a robbery and a kidnapping charge. The defendant claimed that one reason he pled guilty was an unsubstantiated rumor that the victim was

pregnant. Defense counsel did not investigate the rumor and, in fact, used it to convince the defendant to plead guilty.

Here, the Harveys do not point to any concrete misstatements by Donald which the lawyers should have investigated and which, if investigated, would likely have convinced them not to plead guilty. Timothy stated at the evidentiary hearing that "there were some discrepancies" in Donald's statement, but the only thing he mentioned specifically either to Wilson or at the evidentiary hearing was that Donald overstated the extent of the dealings between Greenwood and the Harveys. This fact, however, could only be detrimental to Timothy's defense, especially on the CCE charge.[17]

James testified that he told LeBrun that Donald's testimony was "mostly lies," but he also did not specify what was incorrect.[18] David testified that "Donald's neighbors, mother, his mother-in-law, his friends down in Liberal, Kansas, for sure could refute it." He, however, did not specifically mention any inaccuracies.

In this case, unlike in *Ford,* the Harveys have not pointed to any material misstatements by Donald. An attorney does not have an obligation to undertake an investigation which, in his reasoned judgment, does not have promise. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Even with the benefit of hindsight, the Harveys cannot point to material portions of Donald's statement which were factually incorrect, or which would have been significant enough to have affected their pleas of guilty.

Moreover, the lawyers also stated (and the district court found) that they were hindered in their investigation by the Harveys' unwillingness to give them leads, es-

---

**17.** Timothy also mentioned that he believed the government overstated the amount (four hundred pounds) of drugs which could be produced from the materials seized at the Wahle Ranch. This evidence, however, would not go to the question of guilt or innocence on any of the counts.

**18.** James did mention that he had discussions, apparently on the telephone, about a "race

horse." He claims the government mistakenly claimed this conversation was about drugs, when, in fact, it was about a race horse the Harveys owned. From the record, we simply cannot discern how investigation of this fact could have helped the defense. As the government observes, it seized the horse in its forfeiture action.

pecially about family members.[19] A defendant's unwillingness to assist his or her attorney in an investigation must be considered in evaluating the attorney's performance.

The Harveys argue that their attorneys should have done more investigation into ways to attack Donald's credibility and competency as a witness. The Harveys informed their lawyers, to varying degrees, that Donald's credibility and competency as a witness could be attacked because Donald suffered from mental illness and had a drug and alcohol abuse problem. Wilson testified that he talked to the Harveys' mother, and he learned that Donald had attempted suicide. LeBrun stated that he did not have time to investigate Donald's credibility because his client informed him the day after Donald's statement was read that he wanted to plead guilty. Burnett testified that after reading Donald's statement, he thought he needed more time to prepare for trial. He planned to request a continuance.

We do not think that the district court erred in finding the lawyers' representation adequate. While a more thorough investigation to determine Donald's competency or credibility should have been undertaken at some time before trial, it was not unreasonable for the lawyers not to have done it before their clients pleaded guilty. The lawyers and their clients were not proceeding under the false assumption that Donald's credibility or competency as a witness could not be attacked. The main problem clearly was the extent of the other evidence, and the fact that the substance of Donald's statement was not directly assailed by the Harveys.

The Harveys argue that the lawyers inaction had a psychological effect on them which influenced their decision to plead guilty. This is simply too speculative. Therefore, the district court did not err in holding that the Harveys' lawyers undertook reasonable investigation with regard to Donald before their clients pleaded guilty.

### 2. The Informant Michael Marlow

The Harveys claim that their lawyers acted ineffectively when they did not interview the government informant Michael Marlow or obtain information on him such as his criminal record or the agreement he had reached with the government about his testimony in this case.

None of the Harveys pointed to specific aspects of Marlow's participation as an informant which could be attacked, except his credibility. As with Donald, the main evidence to be obtained pertained to impeachment.

The lawyers understood the basic ways in which Marlow's testimony could be attacked. Wilson had arranged with the Assistant United States Attorney to interview Marlow and to obtain a copy of his criminal record and the details of the agreement between the government and Marlow. LeBrun believed he had sufficient information—that the government had a deal with Marlow and that Marlow had acted as an informant—to effectively cross-examine him. Marlow's credibility did not deeply concern Burnett. It was "the other evidence" that concerned Burnett.

Ideally, in preparation for a trial, it would have been better to have Marlow's criminal record and the details of his agreement with the government. Marlow was clearly more central to the government's case than Donald. Only Wilson, however, had begun to obtain this information.

Nonetheless, we believe that in terms of advising their clients as to their pleas, this additional information about Marlow would have only confirmed what they already knew: that Marlow had an agreement with the government and a criminal record. Thus, additional information concerning Marlow would have largely been necessary

---

19. The record of the plea hearings largely supports the lawyers' testimony. For example, Timothy expressed his reluctance to implicate others, especially family members. In response to questions about the proposed plea agreement, he stated "[t]he government offered me a plea bargain, which I believe he kept saying I kept turning down the plea bargain, but the bargain was for twelve years and to hurt a member or members of my family, I can't do that."

to try the case to a jury, not to advise the clients before making a guilty plea.

The petitioners again argue that the lawyers' lack of investigation psychologically influenced them to plead guilty. Again, such a claim is largely speculative. Therefore the district court did not err in finding that the Harveys' lawyers undertook a reasonable investigation, although they did not interview Marlow before their clients pleaded guilty.

### B. Other Areas of Preparation

The Harveys contend that their attorneys failed to prepare in other ways:

(1) *No defense witnesses had been subpeonaed.* The record, however, does not indicate that a particular witness should have been called.

(2) *The attorneys had not decided whether their clients should take the stand.* This is a fundamentally tactical decision and one that ultimately is the defendant's to make. In many cases, it is not decided until the government has presented its case-in-chief.

(3) *No chemist was hired to analyze the chemical make-up of the drugs and chemicals seized to determine whether they had a potentially lawful purpose.* The Harveys, however, never suggested to their lawyers that there was indeed a lawful purpose for which they could have been used.

(4) *No investigator was hired.* The Harveys do not point to any particular facts which should have been uncovered by an investigator.[20]

(5) *No substantive motions were filed by the attorneys.* The Harveys suggest no motions which would likely have been meritorious.

(6) *Their attorneys had no defense theory.* The government clearly had a strong case, and each attorney recognized this. Wilson, however, also believed that he had

a tenable defense to the CCE charge against Timothy which relied on bank records. Wilson thought he could argue that Greenwood had more money going through his account showing that Greenwood had managed the criminal enterprise. According to Wilson, Timothy did not approve of that defense because it involved Greenwood.

Burnett stated that he thought he had a tenable defense to the count regarding the telephone calls. He was not asked by opposing counsel what that defense was. LeBrun was never asked whether he had a possible defense.

Moreover, in the face of the overwhelming evidence of guilt, it is not clear that the Harveys had viable defenses. Counsel on this collateral attack have not suggested any. We therefore cannot find the Harveys' attorneys ineffective for failing to develop viable defenses for their clients.

### C. Failure to File Substantive Motions

The Harveys claim their attorneys failed to file motions regarding a possible change of venue either within the district or to a district in another state because of publicity about their trial. There is, however, absolutely no indication in the record this failure influenced the Harvey's decision to plead guilty.

The Harveys also claim their attorneys rendered ineffective assistance by failing to seek a dismissal of the indictment under the Speedy Trial Act. *See* 18 U.S.C. § 3161. The Harveys concede, however, that the only advantage of such a motion would have been that it would have forced the government to reindict them, thereby giving the lawyers more time to prepare for a possible trial or giving the Harveys a chance to retain different lawyers. Again, it is unclear how this would have altered the Harveys' decisions to plead guilty.

---

20. David suggests that an investigator could have uncovered information about the government's plea bargain. Part of that bargain required that the prosecution of other federal cases against David in other jurisdictions be stopped. Although one might speculate that an investigator could have determined that these cases against David were insubstantial and thereby decreased the United States Attorney's plea bargaining power, this certainly cannot be said with any degree of certainty.

There is no indication in the record that the Harveys decided to plead guilty because trial was imminent or that more time would have prompted them to seek different lawyers.

■ The Harveys claim their attorneys failed to file motions to suppress evidence. First, they contend the electronic surveillance of certain telephone conversations and videotapes was subject to possible attack. They argue that because Marlow had to be a consensual participant in the surveillance involving him, their attorneys should have interviewed Marlow to determine the voluntariness of his participation, especially in that the government had the burden of proving that the consent was voluntary and uncoerced. *See United States v. Diaz*, 685 F.2d 252 (8th Cir.1982).

There was, however, strong evidence of consent, namely Marlow had agreed to act as a government informant and had struck a deal with the government. An attorney has no duty to investigate leads that do not appear to be fruitful.

■ The Harveys point to intercepted communications undertaken pursuant to a court-authorized wire-tap. *See* 18 U.S.C. §§ 2510–2520. Under such authorization, the government must seek to minimize the interception of communications unrelated to the purpose of the wiretap and must stop the interception upon discovering what was sought. *See* 18 U.S.C. § 2518(5).

Wilson said he investigated these issues by examining the transcripts of the recorded conversations. He concluded that the government had done the wiretap properly, and he told this to Timothy. LeBrun said he investigated the matter and found that most of the conversations did not concern his client and he did not think there were many instances of "non-drug related conversations."

Burnett stated that he relied primarily on Wilson's research on the wiretap issues, although he did read the transcripts himself. There is simply no evidence in the record that the Harveys' lawyers either failed to investigate the wiretap issues or

to file constructive motions regarding them.

■ Finally, the Harveys claim their lawyers failed to file a motion to suppress the items obtained at the Wahle Ranch. The Harveys point to no facts which would even hint that the search warrant might have been issued on an improper basis.

We therefore hold that the district court did not err in finding that the the Harveys' counsel did not unreasonably fail to file motions for their clients.

**D. Elements of Offense and Necessary Proof**

■ The Harveys claim that their attorneys failed to inform them of the elements and nature of the offenses with which they were charged and of the proof necessary for conviction. We held above that the district court did not err in finding that the Harveys understood the nature of the charges against them. In view of this holding, the Harveys were not prejudiced by any such omissions.

**IV. CONCLUSION**

Timothy, James, and David Harvey knowingly and voluntarily pleaded guilty to the charges against each of them. Their counsel also did not ineffectively represent them in their entering of those pleas, or, assuming their lawyers did in some instances, no prejudice resulted. We therefore affirm the judgment of the district court in all respects.